---

## Case No. 8,477.

### In re LONG.

[26 Leg. Int. 349; [1] 7 Phila. 578; 3 N. B. R. 66.]

District Court, E. D. Pennsylvania. May 14, 1868.

BANKRUPTCY—ASSETS OF THE BANKRUPT—SECRET TRUSTS— PREFERENCE — RESULTING INTEREST— RIGHT OF ASSIGNEE TO CONVEYANCE UPON PAYMENT—FULL DISCLOSURE—DISCHARGE.

1. A. failed in business, owning the fee in part, and the term, under a lease, of the other parts, of certain buildings in which the business was conducted, with an established good will, and owning, absolutely, all the personal property contained in the buildings. He had confessed three judgments,—one to B., a creditor; another to C., his aunt, an alleged creditor; the other to D., a creditor. Under friendly executions upon the judgments of B. and C., the leasehold and other personal property were levied on and sold for less than the amount of B.'s judgment. The purchaser at the sheriff's sale was E., a person in A.'s employment, who bought in pursuance of a previous arrangement with B. For the aggregate of E.'s bids, B., under this arrangement, took E.'s bond, the amount of which was credited on account of B.'s judgment. The understanding was that the business should afterwards be carried on in the same buildings in the name of E., through the agency of A., to secure to B. the payment of all that had been due to him, with interest, and subject thereto, for the benefit of A., or as he might direct. The business was conducted there accordingly, in the name of E., through the agency of A., to secure to B. the payment of all that had been due to him, with interest, and subject thereto, for the benefit of A., or as he might direct. The business was conducted there accordingly, in the name of E., for two years or more after A.'s failure, until the bond of E. to B. and the balance due on B.'s judgment were paid in full out of the avails of the business. E. then, at the request of A., transferred the leasehold and other personal property to C., who executed her bond to E., conditioned to indemnify him against outstanding liabilities incurred while the business had been conducted in his name. He continued in the service of A. in the same subordination as before. The consideration of the transfer to C., as expressed in it, was composed of the penalty of this bond of indemnity, and the amount of C.'s judgment against A. In the meantime, through the procurement of A., in order to carry into effect an understanding between him and D., a friendly execution upon D.'s judgment had been issued and levied on A.'s fee in the other part of the premises, and this part of them had been sold by the sheriff, and bought in by D., to whom it had been conveyed by a duly acknowledged sheriff's deed. Thereupon D. had, in pursuance of the same friendly understanding with A., made a complicated arrangement for the sale of this part of the premises to C., executing a lease to give her a

---

[2] [From 9 N. B. R. 227.]

[1] [Reprinted from 26 Leg. Int. 349, by permission.]

present right of possession, and an agreement entitling her to receive a conveyance upon payment of the price, by stipulated monthly instalments, designated as rent. The amount of these instalments covered that of D.'s former judgment. The purpose of this arrangement had been that the modified equitable interest thus vested nominally in C. should, for the secret benefit of A., be substituted for his former legal fee. C., having thus the nominal equitable ownership of part, and the nominal legal ownership of the rest of the property, executed a power of attorney to A. to carry on the business in her name. He so carried it on, without interference by her, for several years, until her death, when the power was renewed in like form by her administrator. Out of the avails of the business, A. made sundry payments in C.'s lifetime, in her name, to D., on account of the monthly instalments; and, after her death, continued the business in the name of the administrator. C. died insolvent. Her former judgment against A. was not in the inventory of her estate. Upon the settlement of it, he appeared, on the contrary, to have been her creditor. The inventory included the leasehold and other personal property which had been transferred to her by E. In the name of the administrator, a sale of them was made a year after her death for the purpose of closing the accounts of her estate. A.'s nominal agency for the administrator then ceased. The purchaser did not take possession, but the price was accounted for by the administrator, as if received. After this, A. continued in the possession and control of the property and business. At a later period, more than ten years after his failure, having still retained the possession and control, he became a petitioner for adjudication and relief in bankruptcy, under the act of 2d March, 1867. In the schedules accompanying his petition, the former judgment of C. was returned as one of his debts. The buildings, etc., and business, were not mentioned. This property, including the outstanding credits of the business and its good will, should have been available as assets of his estate in bankruptcy for the benefit of his creditors.

2. As to the leasehold and other personal property sold to E. under B.'s execution, if E. had acquired under it an absolute ownership, his transfer to C. would have vested a like absolute ownership in her, and the possession of A., as agent of such successive owners, would not have made the subjects of such possession liable to divestiture through A.'s bankruptcy. But the ownership of E. as purchaser under the execution, not having been absolute, this immunity of the subjects of his purchase subsisted no longer than the continuance of such ownership as he acquired. This was, in equity, an ownership, defeasible on the payment of B.'s former debt out of the avails of the business. There was thus a resulting interest in A., whose former ownership was revested in him so soon as B. was thus paid. E.'s transfer to C. would, therefore, have been wholly inoperative without A.'s concurrence or participation. A. having in fact concurred and participated in it, the title of C., though in form derived from E. as the purchaser under the former execution, was, in effect, derived from a transfer voluntarily made by A. Therefore, assuming the validity of the alleged debt of A. to C., on which her judgment was confessed, and the consequent sufficiency of the consideration of A.'s transfer to her, it was not such a transfer as, after B. had been fully paid, excluded the application of the rule that a debtor's retention of possession renders his transfer ineffectual against creditors.

3. Quaere, whether the existence of the alleged consideration as between C. & A., should, without proof, be assumed as against the assignee in bankruptcy representing the creditors.

4. As to that part of the premises of which the legal fee was vested in D. under the proceedings upon his execution, he was bound by his agreement with C. to convey the same to her

upon payment of the stipulated amounts; and the beneficial interest of the bankrupt in the agreement thus made in her name was sufficiently established to entitle the assignee in bankruptcy to demand the conveyance upon making such payment, or to entitle him to compel a sale, and receive the surplus after such payment.

5. Until a bankrupt has made full and sufficient disclosure, his creditors, or the assignees in bankruptcy, cannot be required to specify objections to his discharge, or definitely abide by their objections, which may have been specified.

This was a voluntary bankruptcy. The bankrupt [William W. Long] alleged that there was no assets. The principal objection to his discharge was the non-disclosure of his alleged ownership of certain buildings in Philadelphia, known as "Long's Varieties," and their contents, including a museum, with its pictures and curiosities, and a concert saloon and general restaurant, with its furniture, etc., and the fixtures and good will of the business carried on there. There was no dispute that in the early part of 1857, and previously, he owned this property. He had a leasehold of part, and the fee simple in the rest, and was absolute owner of all the contents of the buildings. He states in his examination that he is now carrying on the business conducted there, and that he has been engaged in one way or another in the same establishment for more than twenty years. In all the period, beginning in 1857, during which, he says, that he has not been the owner, the property has been entirely in his control. He states his possession to have been that of a mere agent for the persons who, he says, became successively the owners during this period. In the early part of 1857 he was insolvent or in embarrassed circumstances. Three creditors to whom he had previously confessed judgments appear to have had friendly feelings for him. The judgment of one of them, Mr. Tasker, was $5,000, borrowed money; the judgment of another, Mr. Lang,[2] was for a debt of $4,000; and the judgment of the other, Miss Walker, a sister of the bankrupt's mother, was for $6,282.57. There was no question that the debts to Mr. Tasker and Mr. Lang, respectively, had been contracted in good faith, and were wholly due. The bankrupt alleged, in one of the schedules accompanying his petition, that the judgment of Miss Walker was for money lent by her. But this allegation had no support except his own statement.

In the early part of 1857, when some of his creditors were pressing their demands, Mr. Tasker was influenced, by a feeling of kindness, to bring about, under an execution upon his judgment, a sheriff's sale of the leasehold, good will, and fixtures, and all the personal property, of the establishment known as "Long's Varieties." An ar-

---

2 This gentleman's name has been sometimes written in the papers of the case undistinguishably from the name of the bankrupt, Mr. Long.

rangement for this purpose was made by Mr. Tasker with one Thomas Price, who was then in the service of the bankrupt. The arrangement was that the property should be bid in by Price, who was to pay no money, and had no means. Mr. Tasker, not desiring his own name to appear in the business, procured a person named Edmunds to receive a transfer of the judgment, so that the execution might appear to be levied for his use. Mr. Edmunds had no interest whatever in the proceeding, and figured in the business no longer than was necessary in order to give credit for Price's bids at the sheriff's sale.

The preliminary arrangements having been made, executions were issued on the judgment of Mr. Tasker, and on that of Miss Walker, and were both levied; the execution of Miss Walker immediately after Mr. Tasker's. The sheriff sold under both executions. Price bid in all that had been levied on, for an amount a little exceeding $4,000, which was credited on account of Tasker's judgment. The sheriff on 20th February, 1857, executed a bill of sale to Price, who, for the amount which had been thus credited on this judgment, gave his own bond to Mr. Tasker. Price took the nominal possession of the establishment. In his name, and professedly as his agent, the bankrupt carried on the business, which does not appear to have been interrupted. In the course of two years, more or less, Mr. Tasker was repaid the whole amount of his original debt: that is to say, the $4,000, or thereabouts, for which Price had given his bond, and the $1,000, more or less, which was the excess of the original debt above what Price had bid at the sheriff's sale. For several of the payments, amounting together to the latter sum, receipts were produced. As they are expressed, the payments were made by Price. For the remaining payments no vouchers were exhibited; nor did it appear by whom, or in whose name, these payments were made, but the inference from the whole evidence was irresistible that nothing was paid, under either head, from any other source than the avails of the business of the establishment. After Mr. Tasker's debt had been thus paid, he never asserted ownership or interest of any kind in himself.

The payments to Mr. Tasker, in addition to the current expenses, had caused a deficiency in the business conducted in the name of Price. The outstanding liabilities representing this deficiency were, as the bankrupt states, less than $3,000, but more than $2,000. The business itself, therefore, was profitable. On 22d April, 1859, Price executed a bill of sale to Miss Walker, the bankrupt's aunt, whose judgment against him for $6,282.69 has been mentioned. She paid nothing; but on the same day executed her bond to him in the penalty of $3,000, conditioned to pay all outstanding debts of the business, and to indemnify him, etc. The consideration of his bill of sale to her, as expressed in it, was $9,282.69, "being a judgment against William W. Long and a judgment bond"; that is to say, the judgment against him at her suit for $6,282.69, and her bond of indemnity to Price, of which the condition was $3,000. The transfer, was, on its face, an absolute one of all that he had acquired by the sheriff's sale. Price, on thus retiring from the nominal proprietorship, resumed or maintained his former position of a subordinate in the establishment, on weekly wages. Becoming, in the course of time, intemperate, he was discharged from it.

Soon after Miss Walker was substituted as the nominal proprietress, and an arrangement was made and executed in her name, as to that portion of the property of which the bankrupt had owned the fee. This arrangement was thus effected by Mr. Long, the bankrupt, with Mr. Lang, his creditor, who has been already named as the plaintiff in a judgment for $4,000. This creditor deposes that he does not remember that he ever saw Miss Walker at all in reference to the matter. He states that he is no longer a creditor of Mr. Long, that the debt "was made over from Mr. Long to Miss Walker"; that Mr. Long "transferred it to her"; and adds: "I changed the indebtedness upon Mr. Long's application. Accepted Miss Walker as my debtor instead of Mr. Long. Nothing was given me for the change. He was in trouble at the time, and would like to have it transferred to her." The records and papers in evidence explain this. The portion of the property which the bankrupt had owned in fee was levied on at the suit of Mr. Lang, and, in the due course of proceeding, sold, and bought in by Mr. Lang under his execution, and conveyed to him by a sheriff's deed regularly acknowledged. Afterwards, on 1st October, 1859, two papers, together constituting a single transaction, were executed between him and Miss Walker. They were, in form, a lease with an agreement for the sale of the property to her; but were, in effect, an equitable conveyance to her in fee, with immediate possession, charged with the payment to him of $6,000, as purchase money, in the name of rent, by monthly instalments of $50, to be computed from 1st January, 1860. How much has been paid on account of the $6,000 does not precisely appear. Receipts for 21 of the instalments, amounting together to $1,050, have been produced. Mr. Lang, the creditor, deposes that he does not think that as much as the interest on $4,000, the original amount of his debt, has been paid. Of the leasehold part of the property bid in at the sale of 1857, the rent appears to have been from time to time receipted for by the landlord as paid by Price during his nominal ownership, and as paid afterwards by Miss Walker. So the instalments of $50 of

purchase money of the other part of the property appeared to have been receipted for by Mr. Lang as paid by Miss Walker. That all these payments of rent, and payments on account of purchase money, were made out of the avails of the business of the establishment. appeared with no less certainty than as to the payments to Mr. Tasker. That they could have been derived from no other source was confirmed by evidence tending to prove that Miss Walker was not possessed of independent means of her own.

In the spring of 1859 she executed a letter of attorney, authorizing the bankrupt to carry on the business in her name. He continued to do so until she died, in May, 1865. He afterwards continued to do so as agent of her administrator, until the final disposition of her estate in the following year. It then appeared that she had been for many years insolvent. Her creditors received from her estate less than the fourth part of their debts. These debts had been assigned by the respective creditors to one Snyder, to whom the dividends were adjudged. There was a great arrear of interest upon the debts. One of her creditors, who had thus transferred their demands to Snyder, was the bankrupt himself. He had held her note for $92, and as the interest accrued was $32, he must have held it for five years and three-quarters. In the course of the proceedings before an auditor, whose report of the final distribution of her estate was confirmed by the orphans' court, the bankrupt was examined generally as a witness upon any subjects which required explanation. It appeared that, besides his agency under the above-mentioned power as to the property in question, he had been her general agent, having the care and management of all her affairs and business. Her estate, at her death, was represented, in the inventory, to consist of the property in question, and nothing, or next to nothing, else. There was a public sale by the administrator in 1866, a year after her death, when everything, as he alleged, was finally disposed of. The person returned as the principal purchaser is named Beck. He has not been examined, and of his actual relations to the property there is no proof, except that he never took possession of anything, and that the bankrupt retained the possession, as he still does. In 1857, the bankrupt, in conversation with some of his creditors, professed a purpose to discriminate favorably between them and other creditors. In some such conversations he said, after the sale by the sheriff, that he was not less the owner than he had been before. He also, before and after the sheriff's sale, made statements which were, in effect, that, so far as a certain class of his creditors might afterwards be concerned, the sale was a sham.

The real estate, as to which the arrangement with Mr. Lang was made in the name of Miss Walker, has always been, and is now, assessed in the name of the bankrupt. The taxes for last year have not been paid. The bankrupt, in his examination, after stating that the collector had presented his bill for them, says: "I told him I had nothing to do with the payment of those taxes. I told him that I would pay them when I knew that I had a right to pay them. I meant there was an agreement that this property should revert to my aunt. This agreement has been broken, as you know. In the event of getting through the bankrupt court, and being able to make an agreement with Mr. Lang similar to that made with my aunt, I, of course, would pay them."

The bankrupt states that in January, 1860, nearly all his accounts and papers were burned by a fire in his bedroom; that the books of his business, to the time of his embarrassments in 1857, were then consumed; and that he had kept no books of account after that period. In the schedule annexed to his petition, he returned the judgment of Miss Walker for $6,282.69 as one of his debts, and other debts to the amount of about $19,000 (principal), including a judgment of Middleton & Bro. for $2.222.98. It was not among the specified objections to the bankrupt's discharge that he had returned Miss Walker's judgment as a debt; but the return of the judgment of Middleton & Bro., as a debt, was a specified subject of objection. They had sued him in the year 1858, and obtained this judgment. In the autumn of that year, an execution at their suit was levied upon the same effects. which, in the previous year, had been bought in by Price. Under the sheriff's interpleader act, upon a claim of property by Price, there was an issue in the usual form. Under a prior levy upon the execution of Birney, another judgment creditor, there had been a similar claim of property, and a similar issue. This issue with Birney was afterwards tried, and there was a verdict for Price. There was no trial of the issue under the levy at the suit of Middleton & Bro. No execution appears to have been levied upon these effects at any time after the debt of Tasker had been fully discharged. There was no direct proof that after its discharge Middleton & Bro. threatened another levy; but, before the death of Miss Walker, the bankrupt called on them, and asked one of their firm what he would take for the judgment, saying that "he had somebody who would buy it." He was accompanied by a friend named Boone, who, after Miss Walker's death, became the administrator of her estate. Mr. Boone deposes that he bought the judgment of Middleton & Bro. from them in her lifetime for between $300 and $500, and sold it to her, taking for it her papers to its full amount, for which he received, after her death, his pro rata dividend from her estate.

The inventory of her estate contained neither this judgment of Middleton & Bro.

against the bankrupt, nor the judgment for $6,282.69 against him at her own suit. This judgment, at her own suit, formed, as has been stated, part of the consideration expressed in the bill of sale to her by Price in 1859, for his transfer to her of the personal property. This, if Price received the transfer for his own benefit, vested the judgment in him. If he received the transfer for the benefit of the bankrupt, the judgment was released or extinguished. That she did not consider him her debtor was apparent, because she gave her note, as has already been stated, for a small debt to him which she contracted not long after. This judgment, therefore, cannot have been part of her estate, and unless Price held it in his own right, which could not be pretended, was equitably released or extinguished.

The foregoing statement of the facts has been made from a phonographic note of the judge's review of them at the close of the hearing in court. The evidence of the proceedings under the administration of Miss Walker's estate, and its distribution, etc., was adduced at this hearing. All the other proofs had been made before the register in the course of compulsory examinations of the bankrupt and others, under the twenty-sixth section of the act of March 2, 1867 [14 Stat. 529], before his application for a discharge. He had not passed any examination at a public meeting of creditors. Upon his application for a discharge, notice of the time and place of an intended public meeting, at which he was to pass his last examination before the register, was duly given. The register held the meeting, and the bankrupt attended, but he was not examined at it, nor did he then make any further disclosure of his own motion than had been made under the former compulsory examination. This former examination contained no specific exposition of the causes of his insolvency, nor specific account of losses, except in part incidentally to his answers under compulsory interrogation. There was not any oath, in substance or effect, that he had fully and truly disclosed, when, how, to whom, and for what consideration his estate and effects, etc., had been disposed of, etc., except what had been parted with in the regular course of his business, or laid out in the ordinary expenses of living of himself and his family.

The examination and other proofs having been read, THE COURT suggested the following questions for argument: (1) If the case could properly be decided on the disclosures already made, and the other proofs adduced, and upon the objections to the discharge which have been specified, ought the discharge to be granted? (2) Has the bankrupt made sufficient disclosure to enable the court to decide whether he has "in all things conformed to his duty" under the act of congress? (3) Until such sufficient disclosure, can his creditors, or the assignee, be required to specify objections to his discharge, or to abide by their objections already specified? (4) Ought the case be recommitted to the register?

THE COURT expressed a desire to hear the counsel of the bankrupt upon the first, second, and third questions.

Mr. Parsons, for bankrupt, contended, upon the second and third questions, that as the bankrupt had undergone a rigorous examination by creditors, under the twenty-sixth section of the act, and they had received answers to all their inquiries, no further disclosure was necessary; that the assignee and creditors ought therefore to abide by the objections which had been specified; and that some of these objections were unsupported by evidence, and the others unfounded in law. Upon the first and principal question, Mr. Parsons said that as to the bankrupt's alleged interest in the real estate bought in by Mr. Lang at the sale under his execution, whatever might have been the effect of the papers afterwards executed between Mr. Lang and Miss Walker, and whether she had or had not the beneficial ownership, charged with what may remain due to Mr. Lang, this beneficial interest, if any, was not the bankrupt's, but was Miss Walker's, and, upon her death intestate, was vested, by descent, in persons of whom the bankrupt, as her nephew, could not be one, because his mother is living. As to the leasehold and other personal property, Mr. Parsons said that, under the transfer from Price to Miss Walker, she, in her lifetime, and her administrator since her death, and subsequently the purchaser from her administrator, had the same right and interest which Price had acquired as purchaser at the sale under the execution at the suit of Tasker; that, after a fair public divestiture of a debtor's property by a sheriff's sale under an execution, the retention of possession by the former debtor, as agent of the purchaser, and of any number of successive owners deriving title from and under him, could not be regarded as fraudulent against creditors, nor could it render the property liable to execution; and that, if not liable to execution, it had not passed under the assignment in bankruptcy.

The following opinion of the court is written out in part from the phonographer's report, and in part from notes by the judge. What he said upon the first point is reported without omission or abridgement.

CADWALADER, District Judge. Whether an assignee in bankruptcy can establish, against others, the facts which the bankrupt states on his examination, cannot be determined at a hearing like the present, upon objections to his discharge. As against himself, the truth of what he relates, where he has the means of knowledge, must be assumed. Its truth, where favorable to himself, should also be assumed, unless incredible or contradicted by proofs. Upon the

facts admitted and those proved, I see no reason to doubt that the property in question is vested in the assignee in bankruptcy. It is true that Mr. Tasker and Mr. Lang had power to do as they pleased with what they respectively bought in under their executions. Mr. Tasker had such power whether he bought in his own name or in that of Price. After the sale by the sheriff under Tasker's execution, the continuance of the former debtor in possession, as an agent of the purchaser, did not make the property liable to execution at the suit of other creditors. Unless it was thus liable to execution immediately before the commencement of the proceedings in bankruptcy, it has not passed under them to the assignee. In these respects, the law is correctly stated in the argument of the counsel for the bankrupt.

The proceedings under Tasker's execution were therefore effectual for their intended purpose. But what was this purpose? Did it take effect, and, if so, how? Had the bankrupt, for the eleven succeeding years, the possession and control of the property, simply as agent of the successive persons in whose names he has professedly acted as agent? Were they in succession absolute owners, both nominally and beneficially? Or had he, on the contrary, an immediate, or a resulting beneficial interest of his own? If the purpose had been to make an immediate absolute gift to him, the property would, under the present proceedings, be vested in the assignee in bankruptcy. This would have been their effect if an absolute bill of sale had been made by the sheriff to Mr. Tasker, and by Mr. Tasker to the bankrupt. It would not less have been their effect if the bill of sale to Price had been secretly for the absolute benefit of the bankrupt. There cannot, however, be a reasonable supposition that an immediate absolute beneficial interest was vested in the bankrupt in 1857. I say this, because Mr. Tasker was then, as yet, unpaid. The issue under the sheriff's interpleader act was doubtless rightly determined against the opposing execution creditor, because, when this creditor's levy was made, Mr. Tasker was still unpaid. But it by no means follows that, on the other hand, an absolute divestiture of the bankrupt's proprietorship was intended. If he had a resulting beneficial interest, or an interest which was at first conditional or qualified, and if the condition was afterwards fulfilled, or the qualification removed, the property became beneficially his own, and is now vested in the assignee in bankruptcy. Here the question is whether the arrangement with Mr. Tasker was not such that the bankrupt retained a debtor's privilege of redemption, with an ultimate beneficial interest in himself. If such was the arrangement, he became again the absolute beneficial owner so soon as Mr. Tasker was paid

in full.[3] The evidence, I think, shows clearly that this was the case.

Before considering the proofs under this head, some remarks will be made upon the fact that a bond was taken by Mr. Tasker from Price for the amount bid at the sheriff's sale. This fact distinguishes the case from cases otherwise of the same kind, in which a defendant's property is bid in by an execution creditor who has no such new debtor for the amount of the price. In such cases there may be an honorary understanding between the former creditor and the former debtor that the latter may, notwithstanding the extinction of his legal ownership, redeem his former property by the payment of his former debt, or of so much of it as was bid at the sale. When such an understanding has been executed by payment and acceptance, the property will revest in the former owner, although the understanding was at first without consideration, and not binding. Moreover, where the performance or execution has been partial only, by payment and acceptance of a part of the former debt, the understanding, though at first only honorary, may, upon such acceptance, become binding. But until such execution, or partial execution, the former debtor's redemption of his former property depends, in ordinary cases, upon the mere benevolence of his former creditor. Though a privilege of redemption may have been accorded by word of mouth, or by writing unsealed, the concession is without consideration, and, like other gratuitous engagements, not binding while unexecuted. In the present case, the arrangement made with Mr. Tasker has been wholly executed, so far as he was concerned. The ultimate result, therefore, might here be the same as if no bond had been taken by him from Price. But the taking of the bond made a material difference in the primary relations of the parties. It was a sufficient consideration to bind irrevocably Mr. Tasker from the first to carry into effect any arrangement under which the bond may have been re-

---

[3] This proposition, resting, as it does, upon the simple foundation of common sense and common honesty, does not require the support of authority. But in Schott v. Chancellor, 8 Harris [20 Pa. St.] 199, Black, C. J., said: "If personal property is purchased at a sheriff's sale, and left with the defendant in the execution, and it appears that the defendant himself furnished the money which paid for it, who can doubt that it might be taken again on another execution against the same person? If the money was not furnished at the time, but paid afterwards, the case would be equally clear, as showing either that the pretended purchaser was a mere agent of the defendant, or else that a contract existed between them by which the title was to revert to the original owner when he refunded the price. Where the plaintiff in the execution is the purchaser at the sale, and he gives no credit for the proceeds, and afterwards receives full satisfaction of his debt in another way, there is still stronger reason for believing that the business was a sham from beginning to end."

ceived by him. However worthless may have been the personal security of Price in the money market, and it certainly was, in this respect, of no value, the consideration was nevertheless legally sufficient, whatever the arrangement may have been. This may simplify the case hereafter, when the effect, as to other creditors, of some of the subsequent occurrences will be considered. It will then be borne in mind that in the present case the privilege of redemption was not a mere honorary concession by the former creditor, but was a vested right of the former debtor, and not liable to derogation at the former creditor's option. Another more important effect of his taking this bond will also be mentioned hereafter.

In the meantime, the relations of the parties at the date of the bill of sale by the sheriff to Price may be defined very simply. Price was a trustee, first, for the security of Mr. Tasker, and, next, for the benefit of the bankrupt. The security to Mr. Tasker was for Price's bond of about $4,000, and for the balance of about $1,000 of the former judgment. The bankrupt's declarations, made in 1857, to certain of his creditors, are evidence against him that an absolute divestiture of his ownership, through the sheriff's sale of that year, was not intended. I am always very reluctant to attribute importance to what a man has said, or is supposed to have said, in private conversations. It is evidence which must be regarded often with suspicion, and almost always with caution. But evidence of this kind, when it is coincident, as here it is, with all the circumstances of a case which are in proof, cannot be altogether discarded. A remarkable coincidence may also be discovered in the bankrupt's own account of what, while the present proceedings in bankruptcy were pending, he said to a collector of taxes.

There is other evidence which is of a decisive character, that Mr. Tasker never acquired for himself, nor ever enabled Price to acquire, an absolute ownership, and that the sheriff's bill of sale to Price was a mere security. As to Mr. Tasker, he has never, since the debt was, many years ago, repaid, asserted any pretence of ownership or interest of any kind. But it may not be amiss to consider more particularly his relations to the property, and afterwards those of Price. If neither of them had an absolute interest, there must have been an ulterior beneficial interest in the bankrupt. If Mr. Tasker was to have been the absolute owner, he would not have been the creditor of anybody for the amount bid at the sheriff's sale; and, in that case, could not have taken, as he did take, the bond of Price for this amount. Here the act of Mr. Tasker, in taking this bond, is most important, if not conclusive. He took it, says the bankrupt, the same as mine. He cannot have relied upon the personal responsibility of Price, who was a person of no responsibility whatever. Mr. Tasker must have considered himself secured on the property of which the nominal ownership was in Price, and, to the extent of such security, interested in the business conducted in Price's name, by the bankrupt. The question, what was the extent of this beneficial interest of Mr. Tasker, is answered by his own acts, and those of the bankrupt, and of Price, and by the examinations of every one of these three persons under the present proceedings. The only purpose of the security was repayment of the debt. Therefore, when it was repaid out of the proceeds of the business, Mr. Tasker's interest wholly ceased.

Let us next consider more particularly the relations of Price. Had he any such present or ulterior beneficial interest as prevented the revesting of the bankrupt's ownership when Tasker's beneficial interest ceased? Had Price any independent interest whatever of his own? I think not. The question is not whether he might have had such an interest if matters had been so arranged with Mr. Tasker, but whether they were in fact so arranged. Moreover, it is altogether unimportant whether Price had a right to retain the legal title as a security till he should be indemnified against outstanding liabilities incurred by him in the course of the business. On his transfer to Miss Walker, in 1859, he received her bond conditioned for his indemnification in this respect. There is no reason to believe that the condition of this bond was ever broken. Nor is this a material inquiry. His previous right of retaining the legal title until thus indemnified was, in equity, not a proprietary interest, but, at most, a mere lien, or a right analogous to a lien.

Price, in truth, was, from first to last, a mere underling. If he wore, for a season or two, his employer's outer garments, he was dressed in them to play a part under his employer's orders; and, when it had been played out, was disrobed, and put back to his subordinate relation. Afterwards for bad habits or misbehaviour, he was turned out of doors by the same employer. This dismissal of Price from the establishment occurred some time after his bill of sale of 1859 to Miss Walker. At the date of that bill of sale there was of record a judgment for $6,282.69 at her suit against the bankrupt. The bill of sale states that this judgment was received by Price from her as a part of the consideration for his transfer to her. The instrument was thus in effect a transfer of this judgment by her to Price. Miss Walker's relation of creditor on the judgment was therefore ended. This explains the fact that she gave to the bankrupt her note for a debt of $92, afterwards contracted, and also explains the omission of the judgment for $6,282.69 from the inventory of her estate. Now, her transfer of this judgment to Price must have operated in

one or the other of two ways. It either substituted Price for her, making him the equitable plaintiff in the judgment, or else operated as an equitable release or extinguishment of the judgment. If Price had the beneficial ownership of what was thus exchanged for the judgment, there must have been such a mutuality of consideration as to make him the equitable judgment creditor. If, on the contrary, the beneficial ownership of the property which Price transferred to Miss Walker was in the bankrupt, the effect of the instrument was to vest the judgment in the bankrupt himself, and thus release or extinguish it. Of these two alternatives, the latter must be the truth, because, both Price and the bankrupt, in their examinations, depose that Price received no consideration except the bond of indemnity against outstanding liabilities. There is not the slightest probability that Price, if he had really been the bankrupt's creditor on a judgment for $6,282.69 would have suffered himself to be turned summarily out of the establishment, and never afterwards have asserted any adversary right as a creditor. The improbability is increased when we consider the terms and mode of the settlement with Messrs. Middleton, judgment creditors, to an amount comparatively small.

The conclusion is that Price, though once the nominal proprietor, never was a beneficial proprietor, in his own right, of what he transferred to Miss Walker. If so, Price could not, without the bankrupt's participation, transfer any beneficial interest to her. But the transfer may be considered as having been made with the bankrupt's participation; her letter of attorney to the bankrupt, and his acceptance of it, gave to Price's transfer to her the same effect as if she had received the transfer directly from the bankrupt. Here the question arises, what was the title thus acquired by her? It was undoubtedly a valid one, as between her and the bankrupt himself. But the question is, was it a valid title as against creditors proceeding adversarily. Whatever adverse rights of creditors might, before the proceedings in bankruptcy, have been enforceable under executions, are now concentrated in the assignee in bankruptcy. As between him and any party deriving title under Miss Walker, there are two objections to her title, either of them fatal to it. It will be remembered that I am at present considering, not her title under Mr. Lang to the real estate, but only her title to the leasehold and other personal property.

One objection is that no sufficient consideration passed from her to support the transfer to her as against creditors proceeding adversarily. It is not pretended that anything beyond the consideration expressed in the transfer made by Price passed from her. It fully appears that she invested no capital of her own in the business, and, indeed, that she had none to invest.

The twofold consideration expressed was the judgment against the bankrupt and the bond of indemnity. That they constituted a valid consideration, as between the bankrupt and herself, is not a sufficient answer to the objection. Though the judgment were upon a voluntary bond, and no liability but a contingent one was ever incurred on the bond of indemnity, either of them was a sufficient consideration as between the parties. But very different is the definition of a consideration which suffices to sustain a debtor's transfer as against his creditors. As to the bond of indemnity, it was, in form, the assumption of a mere contingent liability. Independently of the form of the instrument, its manifest purpose was merely to insure payment of the debts of the establishment out of the future avails of its business. Then, as to the judgment, it is a rule of equity that, where an alleged purchaser asserts a right adverse to that of creditors, the burden of proof is on him to show that the consideration was for actual value. Recitals that it was for value in deeds, or other writings under which he claims, are not alone sufficient for the purpose. See 1 Atk. 62, and [Boone v. Chiles] 10 Pet. [35 U. S.] 211, 212. If this were not the rule, the consanguinity of the parties to this judgment, and the proofs tending to show that the aunt was not possessed of means of her own, conduce to the conclusion that the bond on which the judgment was confessed was not for a full and valuable consideration. At all events, it must be presumed to have been a voluntary bond, unless the contrary were very clearly proved. But in the present case, if a sufficient consideration were proved, the second objection would prove fatal. The objection is the continuance of the bankrupt in possession after the revesting in him of his former beneficial ownership through the discharge of Tasker's demands against himself and against Price. The publicity attributed to an involuntary transfer of personal property, under an execution fairly levied, prevents the application of the general rule that continuance of possession by a debtor, after a transfer of his property, is a badge of such fraud as renders the transfer voidable by his creditors, though it was a transfer for valuable consideration. The present case was within the exception, so long as any part of Tasker's demands were unpaid, but ceased to be within it so soon as they were fully discharged. Upon their discharge the general rule became applicable. It is unimportant whether they were finally discharged before the time of the transfer to Miss Walker. Price was to have retained the nominal ownership for the security of Tasker until their final discharge, and, as I understand the evidence, did not make the transfer to her until they were paid. They must, at all events, have been finally discharged very soon after it, if not before.

But if, when the transfer was made, a balance were still due Tasker, the effect was the same whenever afterwards the final discharge occurred.

If, after this had occurred, inquiry were made as to the true character of the possession, and a true answer were given, the inquirer must have learned that possession under the sheriff's sale of 1857 had ceased, and that the possession retained was under another title derived through a transfer which was neither public nor involuntary. The possession of the former owner, though he was constituted the agent of his aunt, who had received the transfer, was therefore a badge of fraud. Her title was void as against creditors, and under St. 5 Eliz., as expounded in Twyne's Case [3 Coke, 80], and many decisions in Pennsylvania, was thus void on the ground of constructive fraud, though no actual fraud were imputable, and though a valuable consideration had passed from her.

I have thus far said nothing as to Beck, the alleged purchaser from her administrator of most of the personal effects. This alleged purchaser has not been examined, nor has Snyder, who had, probably through the bankrupt, obtained assignments of the debts of her creditors, and to whom the dividends of her estate were awarded. We do not know whether money was actually paid by Beck, or actually received by Snyder. It is probable that no money passed, and that there was a mere exchange of receipts; but this, however it may have been, is unimportant. We know that the sale effected no change of actual possession or of apparent control. The control and possession have continued in the bankrupt as before.

Lastly, as to the real estate which was the subject of the arrangement made by the bankrupt, in Miss Walker's name, with Mr. Lang, who, under this arrangement, bought in this part of the property at the sale by the sheriff under his execution, it is quite certain that the moneys afterwards from time to time paid, in Miss Walker's name, to him on account of the agreement to purchase, were derived exclusively from receipts of the business of the bankrupt carried on as above in her name. His examination shows that he supposed the right of completing this purchase to have been forfeited by default in the payment of the monthly instalments of the price agreed upon, which were; in the writings, designated as "rent." This notion, that a forfeiture had resulted from such default, was a very natural mistake of a person ignorant of the principles and rules of equitable jurisprudence. The consequence of the mistake has, however, been a disclosure which would remove all doubt, if there had otherwise been any, that the interest under the agreement of purchase, though nominally his aunt's, was controlled by him, and beneficially his own, and that the right of redemption which

he supposed forfeited was in himself. Let us now recur to this disclosure. The taxes were always assessed on this property in his name, and had been previously paid by him. Payment of those of the year before his bankruptcy having been demanded, we have his own statement of his answer to the demand, with his own explanation. He says: "There was an agreement that this property should revert to my aunt. This agreement had been broken, as you know. In the event of getting through the bankrupt court, and being able to make an agreement with Mr. Lang similar to that made with my aunt, I, of course, would pay them." I need not repeat that it was a mistake to suppose a new agreement with Mr. Lang necessary. I have already remarked that, on the contrary, the right of redemption, or of completing the purchase from him, which the bankrupt, through mistake, supposed to have been forfeited, still existed. The bankrupt's own statements, when this mistake of law is corrected, show that, in fact, as this right existed, the control of it was in himself. He cannot then have had such control of it as agent of his aunt, because her death in May, 1865, had revoked his previous nominal agency for her; nor had he the control as an agent of her administrator. The nominal agency for the administrator had ceased in May, 1866. The control of the right was thus in the bankrupt for the benefit of no other person than himself; in other words, it was his own. He continued thus to have it until the commencement of the proceedings in bankruptcy. If so, the equitable ownership subject to the payment of the balance due on account of the purchase money, and the right of completing the purchase, must be now vested in the assignee in bankruptcy, who, upon payment of such balance to Mr. Lang, with interest, may require a conveyance by that gentleman.

There is nothing to warrant a belief that any independent capital of the aunt was ever invested in the business conducted in her name by the bankrupt. The accounts of the administration of her estate show that for the year ending in May, 1866, after many deductions, including a so-called salary of himself, there was a profit, small, it is true, but still a profit, of the business of the establishment in Third street. There is evidence that the previous business, while carried on there in her name, had been profitable, except so far as embarrassments may have been incurred in it through the payments to Mr. Tasker, and afterwards to Mr. Lang, and possibly others, occasioned by pressure of the bankrupt's former creditors. We have seen that such a pressure by Messrs. Middleton may have either absorbed a part of the accruing profits, or involved her in a responsibility which the profits did not suffice to meet.

There can be no fair suggestion of supposed equities in favor of her estate against

the interests of the general body of the bankrupt's creditors, or fair suggestion of considerations of supposed hardship to her creditors. The hardship seems to be rather on the other side. If she chose to suffer herself to be involved in debts incurred in carrying on his business in order to cover it against his former creditors, those former creditors ought not, for this reason, to be postponed in the distribution of his funds to other creditors whose debts may have been afterwards contracted in her name. To what extent, if to any, her liabilities to the creditors to whom she died indebted were thus contracted, is, upon the proofs before us, altogether conjectural. On the distribution by the orphans' court of the estate called hers, these creditors have, since her death, received nearly $2,000 from proceeds of personal property of the establishment, in which, as I have said, no capital of her own appears to have been invested, and which, in truth, was not hers, but the bankrupt's. Upon a distribution of the same fund by this court in bankruptcy, the same creditors would not thus have received the whole of it. The most favorable view for them would have been to consider their demands against her as equitable debts of the bankrupt. Such of these debts as might appear to have been truly contracted in the course of the business conducted by him in her name, for his own benefit, would perhaps have been so considered, and, if so, would have been entitled to a dividend; but in such a dividend his other creditors would participate equally. So far as the parties to whom distribution was awarded by the orphans' court may have been distinctively her own creditors, they would have been excluded by this court from even a dividend. All such considerations of hardship, or of supposed equities and counter equities, are, however, out of place. They could not be entertained without a perversion of those principles of the law of debtor and creditor of which the application has been shown. The assignee does not appear to have as yet taken possession of the property, though it is not easy to surmise by whom, or for whom, possession, if demanded, could have been withheld from him. It certainly could not have been withheld by the bankrupt for himself, or for Price, or for the representatives of his aunt, nor does the assignee, though he seems to consider the possession withheld from him, appear to have instituted proceedings in equity, or at law, to recover it. Of this apparent remissness there may possibly be some explanation in the want of funds, and the unwillingness of parties interested to supply them. If so, whether the explanation suffices to excuse the assignee or not, the danger incurred by the bankrupt is increased, because the twenty-ninth section of the act of congress prohibits his discharge if he has been guilty of any fraud or negligence in the delivery to the assignee of property which ought to be available for the benefit of the creditors.

Heretofore the attitude of this bankrupt has, to all appearance, been that of hostility to his acknowledged creditors,—a hostility always unbecoming a debtor, but most especially unbecoming where, in asking a discharge, he alleges that he has absolutely no assets. Perhaps, however, this may not have been his true attitude. The appearance of it may possibly have been unavoidable from the course of the proceedings. It is to be hoped that he will, without further delay, promote the just interests of his creditors by placing the assignee in possession, and facilitating a profitable disposal by him of the property, including the good will, etc., of the business, and by accounting to him fairly for any money, etc., on hand, and credits outstanding at the commencement of the proceedings, and for all subsequent profits. If he shall do so, the question to be decided, in a future stage of the proceedings, may be whether all claim to a discharge has, for the causes of objection heretofore specified, been already forfeited so absolutely that a discharge cannot hereafter be granted.

As at present advised, if I were finally to decide the case upon the present evidence, I would refuse a discharge; but whether it is too late for him to retrieve himself by adopting the course which I have indicated is a point which may, perhaps, be reserved. I think that the proceedings have not reached the stage in which his creditors can be required to abide by the objections to his discharge which have been specified. The reason is that there had not been a sufficient examination or disclosure before the time appointed for a hearing in court upon his application for a discharge. Unless the counsel of the creditors desire to be heard on the fourth point, the case will be recommitted.

Neither the assignee nor any creditor urging an immediate final decision, this point was not argued; and the case was recommitted to the register.